**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE JAMES MADISON PROJECT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1:07cv01154 (RMU) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

GREGORY G. KATSAS
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

VESPER MEI
(D.C. Bar No. 455778)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Telephone: (202) 514-4686
Facsimile: (202) 616-8470 (fax)
E-mail: vesper.mei@usdoj.gov

Counsel for Defendant

August 8, 2008

**INTRODUCTION**

The CIA was created by the National Security Act of 1947, and was designated as a <u>secret</u> intelligence agency, created to support national policymakers by collecting, analyzing, producing, and disseminating foreign intelligence information, using clandestine means; and conducting special activities as authorized by the President.  In recognition that the CIA could conduct its national security mission most effectively in secret, Congress enacted the Central Intelligence Agency Act of 1949 ("CIA Act") – a special legislative provision to protect the CIA's operational effectiveness by shielding its organization, functions, and employees from disclosure.  <u>See</u> Declaration of Joseph W. Lambert ("Lambert Decl.") ¶ 8.

Through its Freedom of Information Act ("FOIA") request, plaintiff now seeks disclosure of many of the internal workings of the agency, seeking internal regulations governing, for example, CIA personnel procedures, internal CIA organizational units, CIA functions, and CIA security procedures.  Because of the unique nature of the CIA, however, Congress specifically intended to protect the CIA against disclosure of this information, and that information is exempt from release under FOIA.  In Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl's Opp."), plaintiff challenges the adequacy of the CIA's search, the adequacy of its declaration and <u>Vaughn</u> index, and the propriety of its invocation of Exemptions 1, 2, and 3.  None of these challenges has merit.  As set forth below, the CIA's search, declaration, and <u>Vaughn</u> index are adequate, as are its assertions of Exemptions 1, 2, and 3, and 5.  Thus, summary judgment should be granted to the CIA.

**ARGUMENT**

**I.     THE CIA'S SEARCH WAS ADEQUATE.**

Summary judgment on the issue of the adequacy of the search is proper unless a plaintiff can contradict the CIA's account of the search procedure or raise evidence of the CIA's bad faith.  <u>See</u>,

e.g., Founding Church of Scientology of Washington D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C.Cir.1979); Greenberg v. U.S. Dept. of Treasury, 10 F.Supp.2d 3, 13 (D.D.C.,1998). Further, "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." Iturralde v. Comptroller of Currency, 315 F.3d 311, 316 (D.C. Cir. 2003) (quoting SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir.1991)). Here, where plaintiff has not challenged the CIA's good faith in conducting its search, and has offered nothing other than speculation that additional responsive documents may exist, summary judgment should be granted to the defendant.[1]

As set forth in the April 24, 2008 Declaration of Joseph W. Lambert, when the CIA first receives a FOIA request, it determines which CIA components might reasonably be expected to possess records responsive to a particular request, and transmits a copy to each relevant component. Lambert Decl. ¶ 25. In this case, because the CIA maintains its internal regulations in a single searchable records system, CIA personnel reasonably calculated that this records system would contain the regulations responsive to plaintiff's FOIA request, and searched that system. Id. ¶ 15. That search – a search for a finite set of documents in a single records system – was adequate.

Throughout its brief, plaintiff confuses the question of whether additional regulations exist with whether there are additional regulations that are actually *responsive* to plaintiff's FOIA request. While the CIA acknowledges that it has additional regulations, this fact is irrelevant to the question

---

[1] While plaintiff hints at bad faith in detailing the administrative delays that it experienced, Pl's Opp. 5-6, it could have remedied those delays simply by filing suit earlier. See 5 U.S.C. §§ 552(a)(6)(A)(i), 552(a)(6)(C)(i) (deeming requestor to have exhausted administrative remedies if agency fails to comply with request for records within twenty business days of receipt, and allowing filing of suit). In any event, a delay in the processing of a FOIA request does not equate to an inadequacy of search.

of whether its search was adequate.  Rather, the relevant question is whether additional regulations exist that are *responsive* to plaintiff's FOIA request, and whether the CIA's search is inadequate as a result.  Plaintiff, however, has pointed to nothing concrete to show that additional responsive records in fact exist, and has not shown that the CIA's search was inadequate.

Plaintiff contends that the CIA's refusal to "provide an unclassified index of all responsive regulations," Pl's Opp. 9-10, somehow shows the inadequacy of the CIA's search.  This contention is meritless.  Providing an index consisting of each *responsive* regulation's numerical identifier and subject heading would not supply the plaintiff with any meaningful information in addition to what it already has.  The CIA has released to the plaintiff what it can about each regulation, and although the Vaughn index does not supply numerical identifiers for those regulations that were withheld in full, it does provide a general subject heading for each.  Plaintiff does not specify how such an index would allow it to further evaluate the adequacy of the CIA's search, and, in fact, this index would provide plaintiff with only the addition of the actual regulation title and number over the list of regulations that plaintiff already has – information that would require the CIA to disclose exempt information.  Moreover, this would not aid plaintiff in determining whether the CIA's search was adequate.

Plaintiff also contends that existing Executive Orders and federal statutes identified in the portions of the regulations that were disclosed indicate that "other regulations were required to be created in order to implement the directives of those sources of authority."  Pl's Opp. 15.  This argument, however, again overlooks an important point: plaintiff did not seek *every* internal CIA regulation; rather, its FOIA request was limited to eight categories of documents: (1) personnel issues; (2) the granting or revocation of security clearances; (3) grievance procedures; (4)

disciplinary procedures; (5) the Prepublication Review Board; (6) declassification of information; (7) the Historical Advisory Board; and (8) the implementation of the Freedom of Information and Privacy Acts.  Pl's' Compl. ¶ 5; Ex. B to Lambert Decl.  Simply because additional regulations might exist that rely upon the authorities cited by plaintiff does not mean that those regulations are in any way responsive to plaintiff's FOIA request.

Plaintiff identifies, for example, Executive Order 12333, § 3.2 (Dec. 4, 1981), see Pl's Opp. 15, entitled "United States Intelligence Activities," as a source of authority for the CIA's allegedly missing regulations.  That provision broadly provides: "The NSC, the Secretary of Defense, the Attorney General, and the Director of Central Intelligence shall issue such appropriate directives and procedures as are necessary to implement this Order."  Id., 46 Fed. Reg. 59941, 59952 (Dec. 4, 1981).  While plaintiff is certainly correct that the CIA may have additional internal regulations that rely upon this source of authority (which could arguably serve as a source of authority for every regulation promulgated by the CIA), plaintiff has offered nothing beyond rank speculation that additional CIA regulations exist that both rely upon this Executive Order as authority and are actually responsive to plaintiff's FOIA request.

Plaintiff's further citations likewise prove nothing.  50 U.S.C. § 401, for example, is similarly broad, stating: "In enacting this legislation, it is the intent of Congress to provide a comprehensive program for the future security of the United States; to provide for the establishment of integrated policies and procedures for the departments, agencies, and functions of the Government relating to the national security."  And 50 U.S.C. § 403 et seq. contains both the National Security Act and the CIA Act, which serves as the authorizing statutes for those agencies.  In short, while plaintiff has identified a number of Executive Orders and statutes that certainly might serve as the

authorizing statute for additional CIA internal regulations, plaintiff has offered no evidence that there are additional *responsive* regulations that exist.[2]

Plaintiff next identifies categories of documents in which it speculates additional documents may exist. Pl's Opp. 13-17. Plaintiff's speculation, however, cannot defeat the adequacy of the CIA's search. See Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004) ("Likewise, the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records."). Thus, while plaintiff argues, for example, that additional regulations *may* exist pertaining to "(a) training policies and procedures and procedures for adjudication of security clearances; (b) oversight procedures for preventing the occurrence of discrimination in the security clearance process; and (c) procedures for ensuring reciprocal acceptance of security clearances" Pl's Opp. 15, even if such documents existed, they would not be responsive to plaintiff's FOIA request in this case, which sought only regulations pertaining to "the granting or revocation of security clearances" a subject that is not clearly related to the examples cited by plaintiff.[3] See Lambert Decl. ¶ 11, Ex. B thereto. Such speculation, again, does not mean that the CIA's search was inadequate.

Plaintiff also complains that the CIA did not release any documents detailing the

---

[2] Plaintiff's argument that the numerical gaps in the regulations that it received "highlights the deficiencies in the agency's search," Pl's Opp. 14, may be similarly disposed of. All the numerical gaps show is that additional regulations likely exist (which the CIA does not dispute). The existence of additional regulations, however, does not in any way suggest that there are additional *responsive* regulations that have not been processed and released to plaintiff.

[3] With respect to the categories of grievance procedures and disciplinary procedures, plaintiff identifies regulations released by the CIA but makes no argument that those records are in any way inadequate.

composition, procedures, and authority of the "Historical Advisory Board." Pl's Opp. 17. But, as plaintiff admits, the actual name of what plaintiff calls the "Historical Advisory Board" is the "Historical Review Program" – there is no reason that the CIA should have searched under "Historical Review Program" rather than what the plaintiff actually sought in its FOIA request. See Nurse v. Secretary of Air Force, 231 F.Supp.2d 323, 330 (D.D.C. 2002) (agency not required to exercise "clairvoyant capabilities" to determine the nature of plaintiff's request). Nor does the fact that the CIA did not release any regulations detailing the implementation of the Freedom of Information Act or the Privacy Act render its search inadequate – those regulations are publicly available (plaintiff's FOIA request sought copies of internal CIA regulations), and published in the Code of Federal Regulations, at 32 C.F.R. §§ 1900 et seq. (FOIA) and 1901 et seq. (Privacy Act). Pl's Opp. 17; Ex. B to Lambert Decl.

Finally, plaintiff's argument that "[t]he CIA did not identify any regulations detailing the composition, procedures and scope of the Prepublication Review Board ('PRB')" is disingenuous at best. Pl's Opp. 16. Plaintiff currently has an additional FOIA case against the CIA pending in this Court, which was originally on the same schedule for release of documents and briefing of summary judgment as this one. Compare Sept. 24, 2007 Joint Status Report, Docket #8 with Nov. 2, 2007 Joint Status Report in JMP v. CIA, 07-cv-01382 (RMU), Docket #5. The documents in the two cases were released to plaintiff on January 10 and January 11, 2008. In the other case, plaintiff received the version of the PRB regulation that was in effect on June 27, 2007 (as well as other documents), and has in fact posted that document on its website. See Ex. 1, available at http://www.jamesmadisonproject.org/files/2007%20CIA%20PRB%20Regs.pdf. Simply because the CIA did not copy the document twice and include it in two packages of documents that it

released to plaintiff one day apart does not render the CIA's search inadequate. Summary judgment should be granted to the defendant on the adequacy of its search.

## II.    THE CIA HAS PROPERLY INVOKED EXEMPTIONS 1, 2, AND 3.

Plaintiff contends that the CIA's affidavit is not sufficient to support its invocation of Exemptions 1, 2, and 3. As set forth below, however, the combination of the Lambert Declaration and the <u>Vaughn</u> index sufficiently details the CIA's withholdings. The CIA properly invoked Exemptions 1, 2, and 3, and these withholdings should be upheld by the Court.

### A.    The Lambert Declaration and <u>Vaughn</u> Index are Sufficient.

Plaintiff's challenges to the CIA's withholdings are based not on the substance of the information withheld, but on what plaintiff alleges are the inadequacies of the Lambert Declaration and accompanying <u>Vaughn</u> index. Pl's Opp. 18-20. At the outset, plaintiff contends that the agency "must provide 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." <u>King v. DOJ</u>, 830 F.2d 210, 219 (D.C. Cir. 1987). But in <u>Morley v. CIA</u>, 508 F.3d 1108, 1123 (D.C. Cir. 2007), the D.C. Circuit specifically approved a <u>Vaughn</u> index like the one provided by the CIA in this case:

> Although the CIA has not matched each redaction with a specific exemption, its <u>Vaughn</u> index does identify the exemptions claimed for each individual document. . . . [t]he descriptions of the documents in the <u>Vaughn</u> index, while categorical and with little variation from page to page, convey enough information for [plaintiff] and the court to identify the records referenced and understand the basic reasoning behind the claimed exemptions. Summary judgment was therefore appropriate on the adequacy of the CIA's <u>Vaughn</u> index.

Here, as in <u>Morley</u>, the CIA's <u>Vaughn</u> index does identify the exemptions claimed for each individual document, with enough description to allow the plaintiff and the Court to identify the

records referenced and understand the basic reasoning behind the claimed exemptions. As a result, as in Morley, summary judgment is appropriate on the adequacy of the CIA's Vaughn index. See also Judicial Watch, Inc. v. FDA, 449 F.3d 141, 148 (D.C. Cir. 2006) ("The FDA's decision to tie each document to one or more claimed exemptions in its index and then summarize the commonalities of the documents in a supporting affidavit is a legitimate way of serving those functions [of a Vaughn index]").[4]

### B.    The Agency Properly Invoked Exemption 3.

As set forth in the Lambert Declaration, the CIA withheld information in the regulations under Exemption 3 that would disclose CIA organization, functions, employee names, official titles, and intelligence sources and/or intelligence methods. Lambert Decl. ¶ 56. And, in fact, all of the CIA's internal regulations, as documents describing the internal practices and procedures used by the CIA, contain intelligence methods that are absolutely protected from disclosure. See also Lambert Decl. ¶¶ 20-23 (discussing background of regulations and problems with redactions).

Through the combination of the Lambert Declaration and the Vaughn index, the CIA has properly and adequately detailed its Exemption 3 withholdings, and its determination that such

---

[4] In any case, if the Court were to find that the defendant's submission is inadequate to permit the Court to conduct a de novo review, rather than order discovery or the immediate release of the documents in question, the Court should remand to the agency and order submission of a more detailed index. See, e.g., Campbell v. DOJ, 164 F.3d 20, 31 (D.C. Cir. 1998) ("On remand, the district court can either review the documents in camera or require the FBI to provide a new declaration. . . . The latter course is favored where agency affidavits are facially inadequate[.]") (citation omitted); The Nation Magazine v. Customs Serv., 71 F.3d 885, 892, 895 (D.C. Cir. 1995) (remanding for Customs to provide additional information and affidavits); Meeropol v. Meese, 790 F.2d 942, 960 (D.C. Cir. 1986) (remanding to district court to order FBI to reprocess certain records); Greenberg, 10 F. Supp. 2d at 20 (directing agency to produce new, more detailed Vaughn index); Branch v. FBI, 658 F. Supp. 204, 206 (D.D.C. 1987) (remand to order agency to submit more detailed index).

-8-

information should not be disclosed is entitled to deference by the Court:

> [I]t is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process.

CIA v. Sims, 471 U.S. 159, 180 (1985). As set forth in defendant's opening brief, with respect to the CIA's Exemption 3 claims, the sole task for the court "is to determine whether or not the material withheld falls within the exemption claimed." Fitzgibbon v. CIA, 911 F.2d 755, 62 (D.C. Cir. 1990). In making this determination, the court is to "accord substantial weight and due consideration to the CIA's affidavits." Id. The CIA has provided sufficient information for the Court to determine that the information withheld in fact falls within Exemption 3.

Plaintiff does not dispute that the CIA's intelligence sources and methods, as well as organizational and functional information, are absolutely protected from disclosure under the National Security Act and the CIA Act. Instead, plaintiff contends that the CIA's declaration and Vaughn index are inadequate to describe how information protected by Exemption 3 is contained within the regulations, and "how disclosure would jeopardize intelligence methods." Pl's Opp. 28. Accepting plaintiff's argument, however, would essentially require the CIA to show potential harm to national security (through danger to intelligence methods) in order to have its invocation of Exemption 3 upheld. As plaintiff itself acknowledges, such a showing is not required. Pl's Opp. 26; Hayden v. Nat'l Sec. Agency/Central Sec. Serv., 608 F.2d 1381, 1390 (D.C. Cir. 1979).

In addition, the definition of "intelligence methods" is broader than what the plaintiff apparently understands. "[T]he definition of 'intelligence methods' is not limited to sophisticated techniques and electronic devices. Rather, 'intelligence methods' include the special practices and procedures of an intelligence agency." Lambert Decl. ¶ 58. This, obviously, would include the

-9-

information contained in the CIA's internal regulations, which, by definition, govern the CIA's internal practices and procedures. And such information is absolutely protected from disclosure by the National Security Act. Id. Further, aside from the National Security Act's protection of intelligence methods, the CIA Act also provides protection from disclosure of the "organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." See 50 U.S.C. § 403g, as amended. Taken together, these two statutes provide absolute protection to the regulations governing the CIA's internal practices and procedures – with no required showing of how release of the information would "jeopardize intelligence methods."

As a result, plaintiff's specific challenge to two regulations on Exemption 3 grounds fails. Pl's Opp. 27-28. Plaintiff's argument that, for example, a regulation pertaining to "dependent children" does not "disclose names or functions of CIA employees, let alone concern intelligence methods or activities" is without merit. Pl's Opp. 28. Here, the Lambert Declaration's explanation for the information withheld under Exemption 1 sheds additional light on the CIA's Exemption 3 withholdings. As the Vaughn Index explains, information withheld under Exemption 1 within the "Dependent Children" regulation "contains information concerning classified CIA information systems, intelligence methods, and locations of CIA personnel and activities." Lambert Decl. Ex. A, MORI 1511380. Such systems, methods, and locations certainly fall within the category of internal practices and procedures used by the CIA, and thus within the category of intelligence methods protected from disclosure. Further, contrary to plaintiff's argument, it requires little stretch to see how a regulation on "Dependent Children" would disclose the "organization, functions, names, or official titles of CIA employees" – information protected under the CIA Act and Exemption 3.

-10-

Similarly, the <u>Vaughn</u> Index description of the regulation about "CIA Files," Lambert Decl.

Ex. A, MORI 1511383, makes clear that the regulation describes CIA filing systems, and naturally

contains information about "internal agency file management procedures and instructions," as well

as "internal information review procedures" and "official titles." <u>Id.</u> Such information falls within

the realm both of internal practices and procedures protected by the National Security Act, as well

as the official titles protected by the CIA Act. Plaintiff's argument is without merit, and the CIA's

Exemption 3 withholdings should be upheld.[5]

## C.    The Agency Properly Invoked Exemption 1.

As set forth in the CIA's opening brief, summary judgment for the government in an

Exemption 1 FOIA action should be granted on the basis of agency affidavits if they simply contain

"reasonable specificity" rather than conclusory statements, and if they are not called into question

by contradictory evidence in the record or by evidence of agency bad faith. <u>Halperin v. CIA</u>, 629

F.2d 144, 148 (D.C. Cir. 1980). The test for the Court is "whether the President has determined by

Executive Order that particular documents are to be kept secret."[6] <u>EPA v. Mink</u>, 410 U.S. 73, 82

(1973). The FOIA is not meant to "subject executive security classifications to judicial review at

---

[5] Nor, as can be seen from these descriptions themselves, are these mere "boilerplate, conclusory affidavits." Pl's Opp. 26. Rather, the description of the information withheld from each document is unique to the document.

[6] Plaintiff's discussion of the Report of the Commission on Protecting and Reducing Government Secrecy is irrelevant. None of the examples of "unwarranted excessive secrecy exercised by the past several Administrations," Pl's Opp. 4, relate to the CIA. More generally, the Commission's Report is certainly not evidence of anything in this case, in which the CIA has properly invoked FOIA Exemptions 1, 2, and 3. Nor is how any other agency treats its regulations relevant to disposition of the CIA's summary judgment motion. <u>See</u> Declaration of Mark Zaid ¶¶ 17-21. Moreover, to the extent that Mr. Zaid seeks to testify in his declaration as to what his experience has been in litigating against the CIA and other agencies, his testimony is irrelevant to disposition of the CIA's summary judgment motion in this case.

the insistence of anyone who might seek to question them." <u>Id.</u>  As set forth in defendant's opening

brief, the CIA followed the procedures set forth in Executive Order 12,958, as amended, in

classifying the documents withheld under exemption (b)(1).  Def's Mem. 9-15.  The CIA's

judgments in this area are entitled to deference.  <u>Students Against Genocide v. Dep't of State</u>, 257

F.3d 828, 837 (D.C. Cir. 2001); <u>Halperin</u>, 629 F.2d at 148.

       Plaintiff contends that the Lambert Declaration is inadequate because it lacks specificity.

This contention is incorrect.  The Lambert Declaration identifies the categories of classified

information withheld from the documents, both generally, in terms of categories of the Executive

Order (<u>see</u>, <u>e.g.</u>, Lambert Decl. ¶¶ 43-50), and specifically, in terms of the categories of information

that would be disclosed: 1) the various categories of CIA personnel; 2) the CIA's internal security

policies and procedures, including those related specifically to the CIA's covert employees; 3) the

CIA's covert officers, including but not limited to, cover mechanisms used, the different types of

CIA covert officers, how the CIA manages its covert employees, and how the CIA processes

inquiries related to its covert employees; 4) certain responsibilities of the CIA's station chiefs; and

5) the CIA's staffing procedures and the size and capabilities of the CIA's workforce.  Lambert

Decl. ¶ 55.  In addition, the Lambert Declaration states: "the release of the classified information

withheld from disclosure would also reveal classified details regarding the CIA's collection, use,

retention, and management of classified human intelligence sources; the organization, management,

and objectives of the CIA's military reserve program; and the training received by CIA employees,

including language training."  <u>Id.</u>

       Far from "lack[ing] any semblance of true specificity," Pl's Opp. 22, the Lambert

Declaration thus identifies the categories of information classified, the harm to national security that

would result from the disclosure of information from each category, and ties each document for which Exemption 1 is claimed to the particular categories of classified information contained in that document. This is all that is required under Exemption 1. <u>See</u> <u>Morley</u>, 508 F.3d at 1124 ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified. [Plaintiff's] argument for declassification does not overcome the *substantial weight* the court must accord to an agency's affidavit concerning the details of the classified status of the disputed record.") (emphasis in original) (internal citations omitted).

The cases to which plaintiff cites are consistent with this result. In <u>Coldiron v. DOJ</u>, 310 F. Supp. 2d 44 (D.D.C. 2004), for example, as plaintiff acknowledges, the court ultimately found that, despite the repetitive nature of the defendant FBI's declaration in that case, the <u>Vaughn</u> index was sufficient. The <u>Coldiron</u> court emphasized its "somewhat narrow" scope of review, and stated that "[o]nce an agency demonstrates that it has tailored its response to the documents requested by a FOIA plaintiff, the court should not second-guess an agency's 'facially reasonable concerns' regarding the harm disclosure may cause to national security." <u>Id.</u> at 53, 54. In that case, where the FBI had "provide[d] several pieces of information that make its declaration, and predictions of likely harm to national security," that seemed tailored to the documents at issue, the court upheld the FBI's exemption 1 invocation. Likewise, the description given of the impact of disclosure of confidential sources in <u>Schrecker v. DOJ</u>, 254 F.3d 162, 166 (D.C. Cir. 2001) that was held sufficient by that court is less detailed than the CIA's description of harm from disclosure of intelligence sources. <u>Compare</u> <u>Schrecker</u>, 254 F.3d at 166 ("the unauthorized disclosure of that source would clearly and demonstrably damage the national security interests of the United States by harming the FBI's ability to continuously recruit sources for current and future use") <u>with</u> Lambert Decl. ¶¶ 46-47.

-13-

In this case, and consistent with <u>Coldiron</u>, the CIA has provided at least three different kinds of information that are tailored to the documents at issue, and are not mere boilerplate. First, Part IV of the Lambert Declaration provides background information on the CIA's internal regulations, explaining how all of the regulations contain sensitive information on the internal workings of the CIA, a clandestine intelligence agency. The Lambert Declaration specifically outlines how disclosure of such information:

> can provide the pieces necessary to complete a puzzle and expose CIA sources, methods, organization, or functions, including but not limited to, the CIA's internal personnel and security procedures and the CIA's internal procedures used to conceal the affiliation between the CIA and its covert officers. . . [and] would help foreign intelligence services, *inter alia*, circumvent the CIA's security procedures, identify the CIA's covert officers, and, possibly, infiltrate the CIA.

Lambert Decl. ¶¶ 21-22.

Second, as set forth above, the Lambert Declaration identifies both general and specific categories of information that are classified and contained within the regulations, and describes the harm that would result from disclosure of that information. Lambert Decl. ¶¶ 43-50, 55. Third, the <u>Vaughn</u> index is document-specific, with different descriptions of information withheld under Exemption 1 depending on which document is at issue. <u>See</u>, <u>e.g.</u>, MORI 1511294 (exemption 1 information "includes information disclosing intelligence sources and methods and locations of CIA intelligence collection activities); MORI 1511375 (exemption 1 information "includes information concerning classified CIA intelligence and counterintelligence methods and activities, functions, programs, personnel, and locations"); MORI 1511378 (exemption 1 information "includes information concerning classified CIA organizational units, authorities, functions, intelligence methods and activities, and personnel"). Taken together, the Lambert Declaration and <u>Vaughn</u> index provide sufficient detail to warrant a grant of summary judgment by this Court.

-14-

Finally, plaintiff challenges certain withholdings piecemeal, for example, contending that the descriptions for regulations entitled "insurance" or "financial regulation," are insufficient. See Pl's Opp. 24. But, as defendant pointed out in its opening brief, classification decisions depend not only on the specific information involved, but on the context in which it is found. Def's Mem. 11. "Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate." Halkin v. Helms, 598 F.2d 1, 8 (D.C. Cir. 1978). As a result, facts that are in isolation unclassified, may be classified because when aggregated and discussed in the context of the responsive records, they would reveal another underlying fact, association, or relationship that is classified. Halperin, 629 F.2d at 150 (observing that "each individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself"); see also E.O. 12958, Sec. 1.7(e), as amended. Thus, information that may not look to the layperson as though it should be classified, has been classified because of what it might reveal when added to the sum of the information already disclosed. See Lambert Decl. ¶¶ 21-23. In addition, as the Lambert Declaration explains, "intelligence methods" encompass the "special internal practices and procedures of an intelligence agency," Lambert Decl. ¶ 49, and knowledge of, or insights into, such practices "would be of invaluable assistance to those who wish to detect, penetrate, counter, or evaluate CIA activities in ways inimical to U.S. security." Id. This explanation, together with the problem of revealing even incremental bits of additional information, as explained in the Lambert Declaration, illustrates how even regulations entitled "insurance" or "financial regulation" contain information on classified intelligence methods.

### D.    The CIA Properly Invoked Exemption 2.

As set forth in the CIA's opening brief, Exemption 2 protects from disclosure "matters that are . . . related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Information falls within this category if it is "used for predominantly internal purposes." Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (quoting Crooker v. ATF, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (en banc)).  Plaintiff does not challenge the CIA's determination that its Exemption 2 withholdings are "used for predominantly internal purposes"; rather, plaintiff focuses its challenge on the second step of the test: whether "disclosure may risk circumvention of agency regulation, . . . or the material relates to trivial administrative matters of no genuine public interest." Morley, 508 F.3d at 1124.  Because the CIA's withholdings meet both steps of this test, summary judgment should be granted on Exemption 2 grounds.

### 1.    The CIA has Sufficiently Justified its "High 2" Withholdings

In its brief, while contending that the CIA has failed to demonstrate how "several regulations" would be rendered "operationally useless" if disclosed, plaintiff ignores the language in the Lambert Declaration that describes the effects of disclosure:

> [I]n general, high (b)(2) information withheld from disclosure includes internal security policies and procedures associated with CIA employees and foreign nationals.  The disclosure of this information could both affect the behavior of the foreign nationals addressed in the regulation and provide foreign intelligence services with keen insights on how to circumvent the CIA's security regulations. Other RIP and DIF documents contain high (b)(2) information relating to the training procedures for a specific category of CIA employees.  If disclosed, this information would allow adversaries keen insights into the CIA's operational and training methods.  Similarly, information revealing security clearance procedures and policies has been withheld under the high (b)(2) exemption where disclosure of the information could render those procedures vulnerable and weaken their effectiveness.

Lambert Decl. ¶ 67.  This language, when paired with the Vaughn index, provides ample context

-16-

and justification for the "high 2" withholdings.

Plaintiff limits its "high 2" challenge to just three documents.[7]  Pl's Opp. 30.  Plaintiff contends that the language used in the <u>Vaughn</u> index to justify these withholdings is "repeat boilerplate language."  This, however, is demonstrably incorrect.  While portions of the three descriptions challenged by plaintiff may be the same, each description is specifically tailored to the document at issue.  Thus, MORI 1511374 describes "internal standards, activities, priorities, procedures and functions," while MORI 1511379 describes "internal operational procedures and functions."  MORI 1511385 describes "internal investigatory, confidentiality, and dispute resolution procedures therein, and disclosure of the issues to which such procedures do not apply."  The reasoning for the withholding of that information within the document differs from the other two as well: disclosure "would provide insight into external CIA investigatory procedures and would disrupt the effective operation of CIA activities that are internal and confidential in nature."

It is easy to see how disclosure of the information withheld under the "high 2" exemption would be rendered operationally useless.  With respect to the "Financial Regulation" regulation, disclosure of information regulating reporting of employees' financial interests would make it easy for an individual seeking to infiltrate the CIA to arrange his or her assets in order to avoid such reporting requirements.  With respect to the "Employee Insurance" regulation, disclosure of information such as guidelines for an employee's professional liability insurance could help someone to effectively blackmail an employee who could not follow those guidelines and thus had no insurance.  And disclosure of the CIA's dispute resolution guidelines would enable individuals

---

[7] While plaintiff calls these three regulations "[a] sample," Pl's Opp. 30, it does not give any further examples, and does not directly challenge any others.  Because the language used in the <u>Vaughn</u> index is tailored to each document, each document must be evaluated individually.

to game the system, or to work around the guidelines in bringing their disputes.

Moreover, the information withheld falls well within the ambit of the cases plaintiff cites. In Schiller, 964 F.2d at 1208, the court found that disclosure of documents containing guidelines on implementing the Equal Access to Justice Act would reveal the NLRB's litigation strategy, rendering the documents obsolete for the purpose for which they were designed; similarly, in NTEU v. U.S. Customs Serv., 802 F.2d 525, 530-31 (D.C. Cir. 1986), the court held that, under Crooker, disclosure of the evaluative criteria used by Customs Service personnel would make it more difficult correctly to evaluate job candidates, and, again, would render the documents obsolete. Likewise, here, disclosure of CIA information generally containing "internal security policies and procedures associated with CIA employees and foreign nationals," "training procedures for a specific category of CIA employees," and "security clearance procedures and policies," Lambert Decl. ¶ 67, would quickly render those documents obsolete. Once such procedures and policies became public, and available to both the public and hostile foreign intelligence services, they would quickly lose their effectiveness, as both individuals and those hostile intelligence services would learn what the CIA was looking for, how its security policies and procedures were implemented, and thus, how they could be circumvented, and how a particular category of CIA employees was trained.

### 2.     The CIA has Sufficiently Justified its "Low 2" Withholdings

Plaintiff contends that the CIA has insufficiently justified its "low 2" withholdings. The CIA's justifications, however, fully comport with the case law of this Circuit, and summary judgment should be granted to the CIA.

Plaintiff claims that the CIA has offered only "vague and boilerplate explanations" in justifying its low 2 withholdings. These claims, however, are belied by the CIA's Vaughn index

-18-

itself, which describes the exact information withheld.  See, e.g., MORI 1511374 (invoking low (b)(2) for: "internal CIA organizational units, internal CIA organizational functions, internal investigatory and review procedures, internal agency forms, internal reporting requirements, official titles, functions of designated employee positions, phone numbers used to communicate internally, internal regulation numbers, administrative codes, an employee identification number, database fields for document file management, internal categories, filing procedures, and document maintenance procedures pertaining only to CIA employees").  These descriptions are far more detailed than the ones, for example, set forth in the Morley case cited by plaintiff, in which the CIA referred only to "CIA internal organizational data" and "internal Agency regulations and practices." Morley, 508 F.3d at 1125.  Here, by contrast, the CIA has provided a detailed list of information withheld under the low 2 exemption for each document affected.

The case law of this circuit requires nothing more.  In Schiller, 964 F.2d at 1208, for example, the court upheld the "low 2" exemption where the Vaughn index and affidavit contained no more information than the CIA provided in this case:

> The documents, according to the Vaughn index and affidavit, contain internal time deadlines and procedures, recordkeeping directions, instructions on which agency officials to contact for assistance, and guidelines on when clearance from Washington is needed for certain decisions – housekeeping matters appropriately withheld under exemption 2.

Nor are Fitzgibbon v. U.S. Secret Service, 747 F. Supp. 51, 56-57 (D.D.C. 1990), or Schwaner v. Dep't of the Air Force, 898 F.2d 793, 798 (D.C. Cir. 1990) applicable here.  Both of those cases turned on the lack of relationship between the information withheld and "agency rules and practices" – because the information withheld did not relate to an agency rule or practice, it was not found to be within the scope of the low 2 exemption.  Here, where all of the information withheld is withheld

-19-

from agency regulations – the very definition of agency rules and practices – neither <u>Fitzgibbon</u> nor

<u>Schwaner</u> applies.  The CIA's low 2 withholdings should be upheld.[8]

## III.    THE CIA HAS DEMONSTRATED THAT ALL SEGREGABLE PORTIONS OF THE RESPONSIVE RECORDS HAVE BEEN RELEASED.

As set forth in the Lambert Declaration, the CIA undertook a page-by-page, line-by-line

review of the documents, individually and as a whole, in order to determine whether meaningful,

reasonably segregable, non-exempt portions of documents could be released.  Lambert Decl., ¶¶ 16,

19, 70, 75-76.  The CIA then released any information that was segregable and not otherwise

exempt.  <u>Id.</u> ¶ 75.  For documents that were denied in full, the CIA determined that no meaningful,

non-exempt portion of the documents reasonably could be segregated for release.  <u>Id.</u> ¶ 76.  The

CIA's findings of segregability are documented in the <u>Vaughn</u> index as well.  In addition, the section

of the Lambert Declaration detailing the background on the CIA's regulations further describes why

no additional information can be released.  <u>Id.</u> ¶¶ 20-23.

Plaintiff focuses on only one sentence of the Lambert Declaration, that the agency

"determined that any non-exempt information is so inextricably intertwined with the exempt

information that there are no meaningful, reasonably segregable, non-exempt portions," Lambert

Decl. ¶¶ 75-76, Pl's Opp. 34, and entirely overlooks the detailed description of the processing of the

documents and the review for segregability described elsewhere in that Declaration.  Contrary to the

cases cited by plaintiff, in which more limited boilerplate statements of the agency's release of

---

[8] Plaintiff contends that the "mosaic" approach is inapplicable here, claiming that the CIA has not provided any sense of context by which to ascertain how disclosure of information contained in the regulations would render those regulations operationally useless.  Pl's Opp. 31 n. 13.  The CIA's justification for this approach is set forth in the Lambert Declaration ¶¶ 7-9 and 68.  In short, the more information that is released, the easier it would be for a foreign intelligence service to gain insight into the CIA's sources, methods, security procedures, organizations, and functions, and to both circumvent those and infiltrate the CIA.

segregable material were found to be inadequate, see Pl's Opp. 34, in this case, Mr. Lambert described the process by which segregability determinations were made, Lambert Decl. ¶¶ 16, 19, 70, 75-76, and explained why further information could not be released.  Compare Davin v. DOJ, 60 F.3d 1043, 1052 (3d Cir. 1995) (declaration failed to describe process by which segregability determinations were made); Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State, 818 F.Supp. 1291, 1300 (N.D. Cal. 1992) (rejecting as insufficient statement that "no segregation of non-exempt, meaningful information can be made for disclosure").  As a result, summary judgment should be granted to the CIA on its segregability determinations.[9]

## IV.     DISCOVERY IS NOT WARRANTED.

Throughout its brief, plaintiff references its desire for discovery.  Pl's Opp. 2, 9, 18, 20, 31, 33, 35-38.  Discovery is generally not appropriate in FOIA actions.  Wheeler v. CIA, 271 F. Supp. 2d 132, 139 (D.D.C. 2003) ("Discovery is generally unavailable in FOIA actions."); Judicial Watch, Inc. v. Exp.-Imp. Bank, 108 F. Supp. 2d 19, 25 (D.D.C. 2000) ("[D]iscovery in a FOIA action is generally inappropriate.");  Pub. Citizen Health Research Group v. FDA, 997 F. Supp. 56, 72 (D.D.C. 1998) ("Discovery is to be sparingly granted in FOIA actions."), aff'd in part, rev'd in part & remanded, 185 F.3d 898 (D.C. Cir. 1999).  "Discovery may be appropriate when the plaintiff can raise sufficient question as to the agency's good faith in processing or in its search."  Judicial Watch, 108 F. Supp. 2d at 25.  Moreover, in seeking to obtain discovery in a FOIA case, the plaintiff "generally 'must establish how the specific discovery requested would create a genuine issue of material fact.'"  Morley v. CIA, 2006 WL 280645, *1 (D.D.C. Feb. 6, 2006).  A court may deny a

---

[9] Plaintiff states that it has no objection to the Court undertaking an in camera review of the unredacted records.  While defendant believes that this would be unnecessary, the defendant similarly has no objection to in camera, ex parte review should it be of assistance to the Court.

request for discovery by a requester "in the bare hope of falling upon something that might impugn the affidavits." Founding Church of Scientology, 610 F.2d at 836 n. 101 (D.C. Cir. 1979).

Here, plaintiff has not raised any arguments that would overcome the presumption against discovery in a FOIA case. First, the plaintiff has not questioned the agency's good faith in either its processing or its search. Rather, plaintiff merely speculates that additional responsive documents may exist, and complains that the agency's declaration and Vaughn index do not provide sufficient detail for the plaintiff or the Court to tell whether the exemptions were properly invoked.[10] Pl's Opp. 7-17. Second, plaintiff has not established how the discovery requested would create a genuine issue of material fact. While plaintiff contends that a comprehensive list of responsive regulations "could fill in at least some of the evidentiary gaps identified by JMP," Zaid Decl. ¶ 22, as set forth more fully above, the CIA has provided the plaintiff with as much of a list of responsive regulations as it could on the public record, and a "list of responsive regulations" would provide plaintiff with little more than it already has received. See supra at 3. Nor does plaintiff detail how "a limited number of interrogatories and depositions" would be more than a "bare hope of falling upon something that might impugn the affidavits," Founding Church of Scientology, 610 F.2d at 836 n. 101, particularly in light of the fact that plaintiff has supplied only speculation that additional documents exist.[11]

---

[10] Although plaintiff deems it not purely speculative, but "logical," plaintiff in fact offers nothing but speculation in support of its arguments that additional documents exist. See discussion at 1-7, supra.

[11] In its brief, plaintiff has confused discovery with the possibility of a remand to the agency for a more detailed declaration on the adequacy of the search/justification for the withholdings. See Pl's Opp. 36. To this end, none of Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 71 (D.C. Cir. 1990); Perry v. Block, 684 F.2d 121, 124-25 (D.C. Cir. 1982); or Western Ctr. For Journalism v. IRS, 116 F. Supp. 2d 1, 5-6 (D.D.C. 2000) allowed the plaintiff discovery to determine whether the agency's search was adequate; rather, Oglesby remanded to the agency for further information about the search, Perry required an additional two searches, and Western Ctr. for Journalism awarded summary judgment after the agency, of its own accord, conducted

Here, there is no evidence of agency bad faith, and the plaintiff has offered nothing beyond speculation that additional records may exist. Discovery is not warranted on the adequacy of the search.

Nor is plaintiff entitled to discovery with respect to the CIA's exemption claims. Plaintiff's sole objection to the CIA's exemption claims is that the agency's affidavit and Vaughn index are insufficient to allow the plaintiff or the Court to evaluate the propriety of the withholdings. Pl's Opp. 18-33. While the CIA believes that the affidavit and Vaughn index, taken together, are sufficient for a grant of summary judgment, if the Court disagrees, the proper remedy for this would not be discovery, but would be a remand to the agency for further description, or in camera, ex parte review by the Court. See supra n. 4. In addition, plaintiff has offered no description of the discovery it seeks with respect to the appropriateness of its Exemption 1, 2, and 3 withholdings except to state that "limited discovery will also be necessary." Pl's Opp. 38. This argument falls far short of the requirement that plaintiff "establish how the specific discovery requested would create a genuine issue of material fact." Morley v. CIA, 2006 WL 280645 at *1.

In fact, the single specific example of information that the plaintiff would seek through discovery relates to the CIA's Exemption 1 claims and the Vaughn index, which plaintiff claims "fails to adequately describe the injury to national security that would follow from the disclosure of the regulations." Pl's Opp. 37 (internal citations omitted). But additional information about the injury to national security that would follow from disclosure of the regulations would risk disclosure of the very information that has been withheld under FOIA Exemption 1, and harm to national

---

an additional search. Only in Weisberg v. DOJ, 705 F.2d 1344 (D.C. Cir. 1983), was discovery permitted with respect to the adequacy of the agency's search, and in that case the plaintiff had more definite evidence of the existence of additional records. See Weisberg v. DOJ, 543 F.2d 308, 310 (D.C. Cir. 1976).

-23-

security as a result.  See, e.g., Military Audit Project v. Casey, 656 F.2d 724, 751 (D.C. Cir. 1981)

("In national security cases, some sacrifice to the ideals of the full adversary process are inevitable.

It is natural that the appellants should seek discovery in the hope that they might turn up details of

the government's position that might be turned to the appellant's advantage.  In national security

cases, however, more detailed information itself may compromise intelligence methods and

sources."); accord Laborers' Internat'l Union of N. Am. v. DOJ, 578 F. Supp. 52, 55-56 (D.D.C.

1983) aff'd, 772 F.2d 919 (D.C. Cir. 1984) (memorandum) (agency would not be compelled to

respond to discovery requests where response would be tantamount to disclosure of information

withheld pursuant to FOIA exemption).  The same dangers would be present were plaintiff permitted

to take discovery into the propriety of the CIA's withholding claims under Exemptions 2 and 3.

Plaintiff has in no way demonstrated either how discovery would create a genuine issue of material

fact, or how discovery could be undertaken in a way that would avoid disclosure of the very

information that has been withheld under a claim of exemption.  As a result, plaintiff is not entitled

to discovery.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the CIA's opening brief, summary

judgment should be granted to the defendant.

Dated: August 8, 2008

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

-24-

ELIZABETH J. SHAPIRO
Assistant Branch Director


 /s/ Vesper Mei                                    
VESPER MEI
(D.C. Bar No. 455778)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-4686
Facsimile:  (202) 616-8470 (fax)
E-mail: vesper.mei@usdoj.gov
Counsel for Defendant

EXHIBIT 1

(b)(2)
(b)(3)

UNCLASSIFIED//~~AIUO~~

**Date:** 05/30/2007

**Category:** ☐ - Public Affairs    **OPR:** ☐

**Title:** ☐ (U) AGENCY PREPUBLICATION REVIEW OF
CERTAIN MATERIAL PREPARED FOR PUBLIC DISSEMINATION

☐

*This regulation was written by* ☐

2. **(U//~~AIUO~~) AGENCY PREPUBLICATION REVIEW OF CERTAIN
MATERIAL PREPARED FOR PUBLIC DISSEMINATION**

> **(U//~~AIUO~~) SYNOPSIS: This regulation sets forth CIA policies and
> procedures for the submission and review of material proposed for
> publication or public dissemination by current and former employees and
> contractors and other individuals obligated by the CIA secrecy agreement to
> protect from unauthorized disclosure certain information they obtain as a
> result of their contact with the CIA. This regulation applies to all forms of
> dissemination, whether in written, oral, electronic, or other forms, and
> whether intended to be an official or nonofficial (that is, personal)
> publication.**

a. **(U//~~AIUO~~) AUTHORITY.** The National Security Act of 1947, as amended, the
Central Intelligence Agency (CIA) Act of 1949, as amended, and Executive Order
12333 require the protection of intelligence sources and methods from unauthorized

APPROVED FOR RELEASE
DATE: JAN 2008

disclosure. Executive Order 12958, as amended, requires protection of classified information from unauthorized disclosure. 18 U.S.C. section 209 prohibits a federal employee from supplementation of salary from any source other than the U.S. Government as compensation for activities related to the employee's service as a Government employee. The *Standards of Ethical Conduct for Employees of the Executive Branch* (5 C.F.R. 2635) are the Government-wide ethics regulations that govern Federal employees. Those regulations include restrictions on outside activities and compensation for teaching, speaking, and writing related to official duties. In Snepp v. U.S., 444 U.S. 507 (1980), the Supreme Court held that individuals who have been authorized access to CIA information, the public disclosure of which could harm the national security, hold positions of special trust and have fiduciary obligations to protect such information. These obligations are reflected in this regulation and in CIA secrecy agreements.

b. (U//AIUO) GENERAL REQUIREMENTS AND DEFINITIONS

(1) The CIA requires all current and former Agency employees and contractors, and others who are obligated by CIA secrecy agreement, to submit for prepublication review to the CIA's Publications Review Board (PRB) all intelligence-related materials intended for publication or public dissemination, whether they will be communicated in writing, speeches, or any other method; and whether they are officially sanctioned or represent personal expressions, except as noted below.

(2) The purpose of prepublication review is to ensure that information damaging to the national security is not disclosed inadvertently; and, for current employees and contractors, to ensure that neither the author's performance of duties, the Agency's mission, nor the foreign relations or security of the U.S. are adversely affected by publication.

(3) The prepublication review requirement does not apply to material that is unrelated to intelligence, foreign relations, or CIA employment or contract matters (for example, material that relates to cooking, stamp collecting, sports, fraternal organizations, and so forth).

(4) Agency approval for publication of nonofficial, personal works (including those of current and former employees and contractors and covered non-Agency personnel) does not represent Agency endorsement or verification of, or agreement with, such works. Therefore, consistent with cover status, authors are required, unless waived in writing by the PRB, to publish the following disclaimer:

"All statements of fact, opinion, or analysis expressed are those of the author and do not reflect the official positions or views of the Central Intelligence Agency (CIA) or any other U.S. Government agency. Nothing in the contents should be construed as asserting or implying U.S. Government authentication of information

or CIA endorsement of the author's views. This material has been reviewed by
the CIA to prevent the disclosure of classified information."

(5) Those who are speaking in a nonofficial capacity must state at the beginning of
their remarks or interview that their views do not necessarily reflect the official
views of the CIA.

(6) A nonofficial or personal publication is a work by anyone who has signed a CIA
secrecy agreement (including a current and former employee or contractor), who
has prepared the work as a private individual and who is not acting in an official
capacity for the Government.

(7) An official publication is a work by anyone who has signed a CIA secrecy
agreement, (including a current employee or contractor), such as an article,
monograph, or speech, that is intended to be unclassified and is prepared as part
of their official duties as a Government employee or contractor acting in an
official capacity.

(8) "Publication" or "public dissemination" in this context means:

(a) for nonofficial (that is, personal) works -- communicating information to one
or more persons; and

(b) for official works -- communicating information in an unclassified manner
where that information is intended, or is likely to be, disseminated to the
public or the media.

(9) Covered non-Agency personnel means individuals who are obligated by a CIA
secrecy agreement to protect from unauthorized disclosure certain information
they obtain as a result of their contact with the CIA.

c. (U//AIUO) THE PUBLICATIONS REVIEW BOARD

(1) The PRB is the Agency body charged with reviewing, coordinating, and formally
approving in writing all proposed nonofficial, personal publications that are
submitted for prepublication. It is also responsible for coordinating the official
release of certain unclassified Agency information to the public. The Board
consist of a Chair and an Executive Secretary -- designated by and reporting
directly to the Chief, Information Management Services (IMS) -- with the rest of
the Board membership composed of senior representatives from the Director of
CIA Area, the National Clandestine Service (NCS), the Directorate of Support,
the Directorate of Science and Technology, the Directorate of Intelligence, the
**Office of Security**, and the NCS's Global Deployment Center, who are designated
by the appropriate Director, or Operating Official with C/IMS concurrence. The
Office of General Counsel (OGC) provides a nonvoting legal advisor.

Case 1:07-cv-01154-RMU    Document 17-2    Filed 08/08/2008    Page 5 of 11

(2) The PRB shall adopt and implement all lawful measures to prevent the publication of information that could damage the national security or foreign relations of the U.S. or adversely affect the CIA's functions or the author's performance of duties, and to ensure that individuals given access to classified information understand and comply with their contractual obligations not to disclose it. When the PRB reviews submissions that involve the equities of any other agency, the PRB shall coordinate its review with the equity-owning agency.

(3) The PRB Chair is authorized unilaterally to represent the Board when disclosure of submitted material so clearly would not harm national security that additional review is unnecessary or when time constraints or other unusual circumstances make it impractical or impossible to convene or consult with the Board. The Chair may also determine that the subject of the material is so narrow or technical that only certain Board members need to be consulted.

## d. (U//AIUO) CONTACTING THE PRB

(1) Former employees and contractors and other covered non-Agency personnel must submit covered nonofficial (personal) materials intended for publication or public dissemination to the PRB by mail, fax, or electronically as follows:

(2) Current employees and contractors must submit covered nonofficial and official materials intended for publication or public dissemination to the PRB by mail, fax, or electronically as follows:

Internal Mail:
Classified Facsimile:
Email: Lotus Note to:
Secure Phone:

(3) Current employees and contractors intending to publish or speak on a nonofficial, personal basis must also complete and submit to the PRB an electronic cover memorandum identifying their immediate supervisor or contracting officer. The PRB will notify the appropriate Agency manager or contracting officer, whose concurrence is necessary for publication.

(4) Review Timelines. As a general rule, the PRB will complete prepublication review for nonofficial publications within 30 days of receipt of the material. Relatively short, time-sensitive submissions (for example, op-ed pieces, letters to the editor, and so forth) will be handled as expeditiously as practicable. Lengthy or complex submissions may require a longer period of time for review, especially if they involve intelligence sources and methods issues. Authors are strongly encouraged to submit drafts of completed works, rather than chapters or portions of such works.

e. (U//AIUO) WHAT IS COVERED

(1) Types of Materials. The prepublication review obligation applies to any written, oral, electronic, or other presentation intended for publication or public dissemination, whether personal or official, that mentions CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other contact with the Agency. The obligation includes, but is not limited to, works of fiction; books; newspaper columns; academic journal articles; magazine articles; resumes or biographical information on Agency employees (submission to the PRB is the exclusive procedure for obtaining approval of proposed resume text); draft *Studies in Intelligence* submissions (whenever the author is informed by the *Studies* editor that the draft article is suitable for *Studies* Editorial Board review); letters to the

editor; book reviews; pamphlets; scholarly papers; scripts; screenplays; internet
blogs, e-mails, or other writings; outlines of oral presentations; speeches; or
testimony prepared for a Federal or state or local executive, legislative, judicial,
or administrative entity; and Officers in Residence (OIRs) speeches and
publications (although oral and written materials prepared by OIRs exclusively
for their classroom instructional purposes are not covered, OIRs must take
particular care to ensure that any anecdotes or other classroom discussions of their
Agency experiences do not inadvertently reveal classified information). Materials
created for submission to the Inspector General and/or the Congress under the
Whistleblower Protection Act and CIA implementing regulations are nonofficial,
personal documents when they are initially created and the author is entitled to
seek a review by the PRB to determine if the materials contain classified
information and, if so, the appropriate level of classification of the information.
If, at any point during or after the whistleblower process, the author wishes to
disseminate his whistleblower complaint to the public, the author must submit his
complaint to the PRB for full prepublication review under this regulation. If the
author is a current employee or contractor who intends to disseminate his
whistleblower complaint to the public, the author must also obtain PRB review of
his materials under paragraph g below.

(2) Review of Draft Documents. Written materials of a nonofficial, personal nature
covered by the regulation must be submitted to the PRB at each stage of their
development before being circulated to publishers, editors, literary agents, co-
authors, ghost writers, reviewers, or the public (that is, anyone who does not have
the requisite clearance and need-to-know to see information that has not yet been
reviewed, but may be classified). This prepublication review requirement is
intended to prevent comparison of different versions of such material, which
would reveal the items that the Agency has deleted. For this reason, PRB review
of material only after it has been submitted to publishers, reviewers, or other
outside parties violates the author's prepublication review obligation. The Agency
reserves the right to conduct a post-publication review of any such material in
order to take necessary protective action to mitigate damage caused by such a
disclosure. Such post-publication review and action does not preclude the U.S.
Government or the CIA from exercising any other legal rights otherwise available
as a result of this prepublication violation. Additionally, the Agency reserves the
right to require the destruction or return to CIA of classified information found to
have been included in earlier versions of a work regardless of the form of the
media involved (for example, paper, floppy disk, hard disk, or other electronic
storage methods).

(3) Public Presentations.

(a) With respect to current and former employees and contractors and covered
non-Agency personnel making intelligence-related speeches, media
interviews, or testimony, they must submit all notes, outlines, or any tangible
preparatory material to the PRB for review. Where no written material has

been prepared specifically in contemplation of the speech, interview, or oral testimony, the individual must contact the PRB Chair or his representative to provide a summary of any and all topics that it is reasonable to assume may be discussed, and points that will or may be made. Unprepared or unrehearsed oral statements do not exempt an individual from possible criminal liability in the event they involve an unauthorized disclosure of classified information.

(b) In addition, with respect to current employees and contractors making official or nonofficial oral intelligence-related statements to the media or to groups where the media will likely be in attendance, prior to granting interviews or making public appearances, the speaker shall contact the PRB for guidance. The PRB will coordinate the review of proposed speeches or media interviews with the component involved, the Office of Public Affairs for guidance regarding media or press relations, and other offices as necessary.

(c) Current employees who must make court appearances or respond to subpoenas must contact OGC for guidance.

(4) Official Publications. The publication or public dissemination of official Agency information by any means, including electronic transmissions, such as internet and unclassified facsimile, is subject to prepublication review. In addition to the types of materials listed in paragraph e(1) above, official publications subject to this review include unclassified monographs; organizational charts; brochures; booklets; flyers; posters; advertisements; films; slides; videotapes; or other issuances, irrespective of physical media such as paper, film, magnetic, optical, or electronic, that mention CIA or intelligence data or activities or material on any subject about which the author has had access to classified information in the course of his employment or other association with the Agency.

(6) Additional PRB Guidance. It is not possible to anticipate all questions that may arise about which materials require prepublication review. Therefore, it is the author's obligation to seek guidance from the PRB on all prepublication review issues not explicitly covered by this regulation.

f. (U//AIUO) **PREPUBLICATION REVIEW GUIDELINES FOR FORMER
EMPLOYEES AND CONTRACTORS, AND COVERED NON-AGENCY
PERSONNEL**

(1) All material proposed for publication or public dissemination must be submitted
to the PRB Chair, as described in paragraph d(1) above. The PRB Chair will have
the responsibility for the review, coordination, and formal approval in writing of
submissions in coordination with appropriate Board members. The PRB Chair
will provide copies of submitted material to all components with equities in such
material, and will also provide copies to all Board members and, upon request, to
any Directorate-level Information Review Officer.

(2) The PRB will review material proposed for publication or public dissemination
solely to determine whether it contains any classified information. Permission to
publish will not be denied solely because the material may be embarrassing to or
critical of the Agency. Former employees, contractors, or non-Agency personnel
must obtain the written approval of the PRB prior to publication.

(3) When it is contemplated that a co-author who has not signed a CIA secrecy
agreement will contribute to a publication subject to prepublication review, the
final version of the publication must clearly identify those portions of the
publication that were authored by the individual subject to the secrecy agreement.
Where there is any ambiguity concerning which individual wrote a section, and
the section was not submitted for review, the Agency reserves the right to
consider the section to be entirely written by the individual subject to the secrecy
agreement and therefore in violation of the individual's prepublication review
obligations.

(4) When otherwise classified information is also available independently in open
sources and can be cited by the author, the PRB will consider the fact in making
its determination on whether that information may be published with the
appropriate citations. Nevertheless, the Agency retains the right to disallow
certain open-source information or citations where, because of the author's
Agency affiliation or position, the reference might confirm the classified content.

g. (U//AIUO) **PREPUBLICATION REVIEW GUIDELINES FOR CURRENT
EMPLOYEES AND CONTRACTORS**

(1) All proposed unclassified material must be submitted to the PRB Chair, as
described in paragraph d(2) above. The PRB Chair will have the responsibility
for the review, coordination, and formal approval in writing of submissions in
coordination with the author's supervisor and other offices as necessary. The PRB
Chair will provide copies of submitted material to all components with equities in
such material, and will also provide copies to all Board members and, upon
request, to any Directorate-level Information Review Officer.

(2) <u>Additional Review Criteria</u>. For current employees and contractors, in addition to the prohibition on revealing classified information, the Agency is also legally authorized to deny permission to publish any official or nonofficial materials on intelligence-related matters set forth in paragraphs e(1) and e(4) above that could:

    (a) reasonably be expected to impair the author's performance of his or her job duties,

    (b) interfere with the authorized functions of the CIA, or

    (c) have an adverse effect on the foreign relations or security of the U.S.

(3) <u>Outside Activities Approval Request</u>. Current employees and contractors must also complete a [          ] (Outside Activity Approval Request) before undertaking any unclassified publication not officially sanctioned by the CIA [          ].

(4) <u>Management Review Process</u>:

    (a) <u>Nonofficial publications</u>. For all nonofficial publications, current employees must complete and submit to the PRB a cover memorandum identifying their immediate supervisor or contracting officer. The PRB will notify these individuals, whose concurrence is necessary for publication.

    (b) <u>Unclassified official publications</u>. For all unclassified official publications (official documents whose dissemination is likely to be broader than the initial, intended Federal Government entity recipient -- for example, unclassified Congressional "constituent replies") that are covered by this regulation, current employees or contractors must first coordinate the document or speech with their management chain. Once initial management acceptance has been made, the employee must then submit the publication to the PRB for final review and approval. (*Classified* official publications are not covered by this regulation and, therefore, are not required to be submitted to the PRB for review.)

## h. (U//AIUO) APPEALS

(1) If the PRB denies all or part of a proposed nonofficial publication, the author may submit additional material in support of publication and request reconsideration by the PRB. In the event the PRB denies the request for reconsideration, the author may appeal. PRB decisions involving nonofficial publications may be appealed to the ADD/CIA within 30 days of the decision. Such an appeal must be in writing and must be sent to the PRB Chair. Appeal documentation must include the material intended for publication and any supporting materials the appealing party wishes the ADD/CIA to consider. The PRB Chair will forward the appeal and relevant documentation through the components that objected to publication of the writing or other product at issue. The Director or Head of Independent Office will affirm or recommend revision of the decision affecting his or her component's equities and will forward that recommendation to OGC. OGC will review the recommendations for legal sufficiency and will make a recommendation to the ADD/CIA for a final Agency decision. The PRB Chair is responsible for staff support to the ADD/CIA. The ADD/CIA will render a written final decision on the appeal. Best efforts will be made to complete the appeal process within 30 days from the date the appeal is submitted.

(2) This regulation is intended to provide direction and guidance for those persons who have prepublication review obligations and those who review material submitted for nonofficial or official publication. Nothing contained in this regulation or in any practice or procedure that implements this regulation is intended to confer, or does confer, any substantive or procedural right of privilege on any person or organization beyond that expressly stated herein.

i. (U//AIUO) BREACH OF SECRECY AGREEMENT. Failure to comply with prepublication review obligations can result in the imposition of civil penalties or damages. When the PRB becomes aware of a potential violation of the CIA secrecy agreement, it will notify OGC and the Office of Security (OS). After the OS review and investigation of the case is completed, if further action is deemed warranted, the OS will refer the matter to OGC, which will report all potentially criminal conduct to the Department of Justice (DoJ) and consult with DoJ regarding any civil remedies that may be pursued.